# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 7, 2004

## MICHAEL BLACKBURN v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Franklin County**
**Case No. 11223-B     J. Curtis Smith, Judge**

_____

**No. M2003-02549-CCA-R3-PC - Filed February 15, 2005**

_____

The Petitioner, Michael Blackburn, was convicted of first degree premeditated murder, first degree felony murder, and aggravated robbery, and the trial court sentenced him to life plus twenty years. This Court affirmed the convictions and sentences on appeal. The Petitioner subsequently filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing. On appeal, the Petitioner contends that the post-conviction court erred because he was denied the effective assistance of counsel. Finding no reversible error, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Glen A. Isbell, Winchester, Tennessee, for the Appellant, Michael Blackburn.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

On December 3, 1998, a jury convicted the Petitioner of first degree premeditated murder, first degree felony murder, and aggravated robbery. The trial court merged the murder convictions, and sentenced the Petitioner to life in prison for the murder conviction and to twenty years for the aggravated robbery conviction, to be served consecutively. This Court summarized the facts on direct appeal as follows:

> At trial, the State called Coffee County Sheriff's Deputy Brian Allen. On August 14, 1996, Deputy Allen was working the midnight shift when the defendant came in around 12:15 a.m. to report a drowning at the Turkey Creek boat ramp. The

defendant reported to him that he, co-defendant Tommy Dickerson, and victim David Singer were at the boat ramp that evening. According to the defendant, co-defendant Dickerson and the victim started arguing and co-defendant Dickerson hit the victim in the face, which knocked the victim into the water. He told Deputy Allen that he tried to help the victim, but that co-defendant Dickerson ordered him back into the truck, threatening him that he would be next if he did not comply. He said that the victim never resurfaced. He told Deputy Allen that they then took the victim's truck to Tullahoma. Because the Turkey Creek boat ramp is in Franklin County, Deputy Allen notified the authorities there.

The State called Deputy Earl Morse of the Franklin County Sheriff's Department, who was dispatched to meet the defendant at the boat ramp, to testify. Deputy Morse observed an article of clothing in the water. He testified that the defendant told him that he, Dickerson, and the victim were hanging out around the boat dock when the victim went down on the dock. The defendant claimed that he told Dickerson that he needed to go home because he had to be up early for work. According to the defendant, Dickerson then went onto the dock and began "messing" with the victim. The two began arguing and the defendant said he saw "a motion come around," heard a "smack," and something then hit the water. The defendant said he then turned on the truck headlights.

The defendant further told Deputy Morse that Dickerson said, "He ain't come up yet," and then, "Let's go, he's dead. Get in the truck." The defendant said that when he tried to go in after the victim, Dickerson told him to get in the truck or he would be next. The two then got into the truck and went to Tullahoma. According to the defendant, he jumped out of the truck at a red light and Dickerson tried to run over him. He said that once he got to his father's house, he told him what had happened and his father told him to go to the police.

At the crime scene, the defendant identified a pair of shoes found in the parking lot as belonging to the victim. He also said that Dickerson was his cousin, but he had only met the victim a few days earlier. He further informed the deputy that Dickerson and the victim had run away from a rehab center in Shelbyville. A search of the boat dock revealed a shirt about four feet from the dock, a pair of blue jeans about ten feet from the end of the dock, and the victim's body 15'7" from the end of the dock. The victim's feet were tied with a blanket and his jeans had been pulled down over the blanket. The victim had scratches and abrasions on his face and head.

The autopsy revealed multiple superficial lacerations on the victim's forehead, linear abrasions on his right shoulder, a bruise on his right wrist, and

–2–

scrapes on his knees and right forearm. The victim had a blood alcohol level of .19%. The medical examiner determined drowning was the cause of the victim's death.

The State also called Franklin County Sheriff's Deputy Danny Warren, who took a statement from the defendant in the early morning hours of August 14, 1996, to testify. The defendant said that Dickerson and the victim had run away from a rehab center on August 12th and had been drinking all day. The defendant met up with Dickerson and the victim around 9:00 p.m. the next evening, August 13, to go to a party at the Traveler's Inn in Manchester. He said that Dickerson and the victim had again been drinking.

The defendant said that when they left, they went to Turkey Creek. Upon arrival, around 9:45 p.m., the victim got out of the truck and went onto the boat dock. The defendant said that he told Dickerson that he needed to get home because he had to be up early for work. He said that Dickerson then got something out of the back of the truck and went onto the dock and told the victim to get up. He said that the two began arguing and then he heard a "smack" and something hit the water. He then turned on the truck headlights and asked Dickerson what was going on. Dickerson replied that the victim was messing around and jumped into the water. He told Deputy Warren that he did not think much of it until Dickerson said that the victim was not coming up. The defendant said that when he offered to jump in after the victim, Dickerson threatened to kill him if he did. He claimed that he was afraid of Dickerson because Dickerson was bigger than him.

According to the defendant, they left Turkey Creek in the victim's truck. He then reiterated his story about stopping at a red light, Dickerson trying to run over him, and getting to his father's house. When questioned about the victim's legs being tied, the defendant claimed he did not know how that happened. He told Deputy Warren that Dickerson and the victim had been arguing earlier because the victim wanted to go home to his family, but Dickerson did not want him to go.

Shortly thereafter, the defendant gave a second statement to Deputy Warren. He told the deputy that Dickerson threatened him if he did not help. So, he tied a blanket around the victim's feet. He said that the victim was conscious, but did not resist them. The defendant claimed that he then blacked out.

Approximately an hour later, the defendant again summoned Deputy Warren with additional facts about the victim's death. He said that when the

three were on their way to the boat dock, Dickerson told the defendant that he was going to rob the victim and kill him. The defendant said that when he objected, Dickerson threatened to kill him. He said that when they arrived, Dickerson ordered him to get a blanket and a pair of pants out of the trunk. The defendant then tied the victim's hands together with the pants and tied his feet together with the blanket. According to the defendant, Dickerson tied the blanket tighter, took $15.00 out of the victim's pocket, and then picked the victim up and threw him off the dock. When again questioned about the victim's pants being around his ankles, the defendant persisted that he did not know.

A couple of days later, on August 16, the defendant gave another statement to Deputy Warren. He said that after they arrived at Turkey Creek, the victim got out of the truck and leaned up against it. Dickerson got out, smiled real big, and hit the victim. After the victim hit the ground, Dickerson got on top of him and started beating him saying, "You want to fight? You want to fight?" Although the victim never said a word, he was awake. At one point though, the victim did ask Dickerson why he was doing this. Dickerson just beat him more.

The defendant claimed that Dickerson got a blanket and a pair of pants out of the truck, and made the victim walk down the boat dock. Again, the defendant insisted that he did not want to participate, but that Dickerson threatened him with death if he did not. Per Dickerson's orders, the defendant tied the victim's hands and feet. Then Dickerson smiled big again and pushed the victim off the end of the dock. The defendant told Deputy Warren that the victim came up a couple of times, but that Dickerson would not let him go in to help the victim.

The two returned to Tullahoma and drove to the Traveler's Inn in Manchester. There the defendant met up with his girlfriend Charity Austin and told her that Dickerson killed the victim. She and the defendant left Manchester, drove to his father's house, and then went to the sheriff. The defendant also told Deputy Warren that Dickerson said the victim was rich and that Dickerson told his sister Rhonda that he was about to rob someone, get some money, and leave town.

The State's final witness was Rhonda Smith, the defendant's first cousin and Dickerson's sister. She testified that on August 12th, the defendant, Dickerson, and Charity Austin came to her house around 11:00 p.m. According to Smith, Dickerson had been drinking, but the defendant had not. The defendant told her that he needed money. When she said she did not have any, he told her he was going to get some money one way or another, even if he had to kill someone. In her presence, the defendant asked Dickerson how much money the

victim had, and Dickerson told him that he was about to receive $400. The defendant said he would kill the victim for that money. He claimed it would be easy to tie some blocks around his feet and throw him off into the water. While at the Smith's house, the defendant also approached Robert Smith about borrowing a shotgun. He told Smith that he needed to make some money. However, Smith told him that he did not loan out his guns. This concluded the State's proof.

The first witness on behalf of the defendant was James Parker, a.k.a. Poncho. He stated that in August 1996, he lived with the defendant's father, Alfred Blackburn. On August 13th, the defendant, Dickerson and the victim were at Parker's house. Evidently, the victim had spent the night at his house, and was going to turn himself in that morning. However, the victim gave Dickerson $40 and they proceeded to drink all day long.

Around 5:00 p.m., Parker kicked everyone out of his house because they were drinking and he did not want to get in trouble with his landlord. Later, around 9:00 p.m., the defendant and Dickerson returned to Parker's house, but the victim was not with them. They talked with the defendant's father and then they left. When Dickerson and the defendant later returned, Janice Brown and Charity Austin were with them. The defendant told his father and Parker what had happened, and the defendant and his father then left to go to the police.

The defense also called Janice Brown to testify. She testified that when the defendant arrived at the Traveler's Inn, he seemed scared. He told her that the victim was at the lake. He said he hoped that the victim was just passed out. However, he also told her that he jumped in the water to help the victim and that Dickerson performed CPR, but then pushed the victim back in. After that, she, Charity and the defendant drove out to the landing, called for the victim, and then returned to Parker's to talk with the defendant's father.

Alfred Blackburn, the defendant's father, also testified on behalf of the defendant. He testified that Dickerson and the victim had been drinking all day on August 13th. Dickerson and the victim had argued several times and Dickerson swung a 2 x 4 piece of lumber at Blackburn when he would not take them to Georgia. Around 11:15 p.m., the defendant came to the house and told him that Dickerson had killed the victim. They then went to the police.

Finally, the defendant testified on his own behalf. At trial, he stated that he did not initially tell police the true story of what happened at the dock because he was afraid his parole would be revoked. He testified that when he, Dickerson and the victim left Poncho's on August 13th, he was driving the victim's truck.

They stopped at a market, and Dickerson wanted to drive. Though Dickerson was drunk, and the defendant did not want him to, Dickerson ended up driving anyway. Dickerson indicated that he wanted to go for a swim, so they headed to Turkey Creek. On the way there, Dickerson told him that he was going to kill the victim. Although the victim was sitting in between Dickerson and the defendant, he had no reaction to this statement.

When they arrived at the dock, Dickerson and the victim got out of the truck and leaned up against it. According to the defendant, Dickerson told the defendant to get out or he would do to him what he was going to do to the victim. The defendant noticed a boat in the water and yelled out to it, hoping to dissuade Dickerson, even though he really did not believe Dickerson was serious. But, the boat drove off. Then Dickerson smiled real big, and hit the victim. After the victim hit the ground, Dickerson got on top of him and started beating him saying, "You want to fight? You want to fight?"

Dickerson got the blanket and pants out of the truck. He took the victim down to the dock, told him to lie on his stomach and then ordered the defendant to tie the victim's hands and feet. Again, the defendant maintained that he tried to resist, but Dickerson threatened him with death if he did not help him. The victim asked Dickerson what he was doing, and Dickerson told him he was about to die. Dickerson then pushed the victim off the end of the dock. The defendant testified that he started to go in after the victim, but that Dickerson again threatened him with death if he did.

They left in the victim's truck and drove back to Parker's, where his father was still located. He did not say anything to his father then about what happened because he was scared of Dickerson. He and Dickerson then drove to Manchester and met up with Charity and Janice. After he told Charity what had happened, he, Charity and Janice went back out to the boat dock to look for the victim. When he did not answer their calls, they drove back to his father's house. He then went to the police with his story.

State v. Michael Blackburn, No. M2000-01202-CCA-R3-CD, 2001 WL 1251239, at *1-5 (Tenn. Crim. App., at Nashville, Oct. 19, 2001), *perm. app. denied* (Tenn. Apr. 8, 2002).

The Petitioner filed a pro se petition for post-conviction relief, which was later amended by appointed counsel. In his petition he alleged, in part, that he received ineffective assistance of counsel because his trial counsel failed to: (1) adequately prepare for trial; (2) give him an assessment of the evidence against him and the applicable law; (3) file a motion to suppress his statements to police; and (4) request any jury charges. The following evidence was presented at

the hearing on the Petitioner's petition for post-conviction relief: Robert S. Peters ("Counsel") testified that he has been practicing law since 1970, and criminal law is a substantial part of his practice. Counsel said that he was appointed to represent the Petitioner on November 8, 1996, and the Petitioner's trial began on December 2, 1998. Counsel said that the time sheet that he submitted to the court shows that, prior to the trial, he spent thirty-one hours out-of-court, and six hours in-court, on the Petitioner's case. He estimated that he actually spent close to twice that number of hours out-of-court, but he did not report those hours.

Counsel testified hat he had "lengthy discussion[s]" with the Petitioner on several occasions about the case. He said that he spoke with the Petitioner each time the Petitioner came to the courthouse, and he visited the Petitioner in jail on the day of trial. Counsel said that he may have met with the Petitioner in jail on other occasions, but he was unsure of exact dates and times. Counsel said that, between October 30, 1997, and December 2, 1998, he wrote the Petitioner two or three letters.

Counsel said that the strategy in the Petitioner's case was "simple." He said that the Petitioner and his co-defendant both made full and complete statements to the police, and the strategy was for the Petitioner to "take the stand, look the jury in the eye and convince them that he was a smaller man, was intimidated by [his co-defendant], and it was [the co-defendant who] committed the crime and that he was afraid, intimidated . . . ." Further, the Petitioner was to tell the jury that, following the commission of the crime, he came back to the scene and admitted what had happened. Counsel said that, originally, one of the Petitioner's defenses was duress. Counsel said that the Petitioner was going to convince the jury that his co-defendant was a violent person who had committed this crime and other violent acts earlier in the day on the same day as the murder.

Counsel testified that he did not explain to the Petitioner how he was going to incorporate the defense of duress. He said the Petitioner was going to tell his story, and, if the jury believed the Petitioner, there was a chance that they would not convict him of the more serious crime. Counsel said that he did not instruct the Petitioner about the law of duress, rather he told the Petitioner to tell the truth and then the jury would decide if the law of duress applied. Counsel said that he did not think that an attorney should tell a client what a client would have to say in order to meet the elements of a defense. Additionally, Counsel said that he intended to tell the jury that the State allowed the Petitioner's co-defendant to plead to second degree murder and then argue to the jury that the Petitioner deserved a lesser punishment. Counsel conceded that the trial judge did not allow him to present this evidence, but he said that this was a strategic decision.

Counsel said that he interviewed both officers in this case, and some, but not all, of the other State's witnesses. He said that he and the Petitioner never disagreed about the trial strategy or which witnesses Counsel interviewed. Counsel testified that he and the Petitioner went over

all of the discovery provided by the State, which included the Petitioner's, and his co-defendant's, statements to police. Counsel said that he did not interview the police officer who searched the Petitioner's co-defendant and found items that were stolen in the robbery on the co-defendant. Counsel explained that, since there was no issue about where these items were found, this was not pertinent to the case. Further, there was no evidence that the Petitioner had these items, so this testimony was unnecessary. Counsel testified that he interviewed each of the witnesses that he called in defense of the Petitioner before they testified at trial.

Counsel testified that he called witnesses to state that the Petitioner's co-defendant had committed this crime. The trial court excluded that testimony at trial, and Counsel appealed that ruling, but it was upheld on appeal. Counsel testified that he thought that, even though the Petitioner's co-defendant did not testify at trial, he could still admit the co-defendant's statements that he killed the victim at trial under an exception to the hearsay rule. Counsel testified that he asserted to the trial court that these statements were admissible pursuant to Tennessee Rule of Evidence 803(e), but the trial court disagreed. Counsel thought that it would be impossible to admit these statements if he called the co-defendant because they were unlikely to be admitted during direct examination. Rather, his strategy was to hope that the State called the co-defendant so that he could cross-examine the co-defendant. Then, when the State did not call the co-defendant, he argued to the jury that the Petitioner was prejudiced by, and the State was to blame for, the co-defendant not being present at trial. Counsel stated that it would have been the "height of idiocy" to have subpoenaed the co-defendant because the co-defendant had already given a statement to police that he was afraid of the Petitioner and, had the co-defendant testified, that information would have been before the jury. Counsel said that, after researching the applicable law, he made a tactical decision not to call the Petitioner's co-defendant because he determined that it would have done more harm than good.

Counsel said that he did not file a motion to suppress any of the statements that the Petitioner gave to police because, since the Petitioner intended to testify, these statements would be admissible during cross-examination. Further, Counsel thought that the statements, on the whole, were favorable to the Petitioner. Counsel stated that, in his opinion, if he got the statements suppressed, and the Petitioner did not testify, their chances "of succeeding would have been much much less. It was a tactical decision on [Counsel's] part." Counsel said that he thought that the Petitioner's only chance to win this case was to tell his truthful story, which was that he was scared and intimidated by the co-defendant and he did not profit from this crime whatsoever. Counsel said that this was a strategy that the Petitioner agreed with. Counsel conceded that some of the officers who testified about the Petitioner's statements would not have been able to testify if he had successfully filed a motion to suppress those statements. Counsel said that, even if the Petitioner's statements were excluded, the State could still place the Petitioner at the scene of the crime because the Petitioner returned to the crime scene with a female friend to look for the victim. Counsel testified that, if this evidence had been excluded, the case might have been a "little different," but the outcome would have been the same.

Counsel testified that part of the reason that he did not file motions to exclude some of the evidence, such as the Petitioner's statements and the fact that he was recently released from prison, was because his strategy was to have the Petitioner testify, therefore, this evidence would have been admissible. He stated that the evidence could only have been excluded if the Petitioner did not testify, which was not his strategy.

Counsel testified that he did not file any jury charges, including a request for a duress instruction. Counsel said that the trial court must not have thought that the elements of duress were present. He testified that, ultimately, their strategy was not duress, but that, while the Petitioner was there, he did not commit the crime. Counsel noted that the jury was instructed on facilitation and other lesser-included offenses.

Counsel testified that he told the Petitioner about the plea offered by the State for the Petitioner to plead guilty to second degree murder, and the Petitioner rejected that offer. Counsel said that he did not think that it was in the Petitioner's best interest to plead guilty if the Petitioner did not want to plead guilty. He said that, if the jury had believed the Petitioner, the Petitioner would have been found not guilty. Counsel reiterated that, even considering the Petitioner's prior criminal history, if the jury believed the Petitioner he would have been found not guilty. Counsel then said that he had recently tried a similar case, in which the jury did not convict a defendant with a "horrendous" record because they believed the defendant.

On cross-examination, Counsel testified that he graduated first in his law school class at the University of Tennessee, and he was editor in chief of the law review. He said that he was a member of the Order of the Coif, an honor society for law students. Counsel said that he has probably tried more criminal cases and more appellate cases than anyone in the county and has argued nearly 200 appellate cases. Counsel testified that he discussed the Petitioner's case with both the Petitioner's father and the district attorney prosecuting the case on multiple occasions. Counsel testified that he never discovered any facts that led him to believe that he could have successfully suppressed the Petitioner's statements to police. Counsel said that some of the statements that the Petitioner made to police were made after the Petitioner voluntarily went to police, and Counsel thought that, because the Petitioner initiated the contact, it would be favorable to the Petitioner's defense. Further, Counsel said that this fact supported the defense theory that the Petitioner's co-defendant was the primary perpetrator of this crime.

Counsel conceded that he, perhaps, should have requested a duress jury instruction, but said that the classic case of duress was not applicable here. He said that the defense strategy was to eliminate the elements that would have been necessary for the jury to convict the Petitioner of both felony and first degree murder. Counsel testified that the State offered to allow the Petitioner to plead guilty to second degree murder, but the Petitioner rejected that offer.

Mary Adams testified that she is the Petitioner's mother, and she said that she "pretty well [had to] tell [Counsel] who all needed to be subpoenaed." She said that she issued and served the seventeen subpoenas in the Petitioner's case. Adams testified that she told Counsel to ask certain questions, and she had to act as his secretary. She said that Counsel "thought we didn't have [any]thing to worry about" with regard to the Petitioner's case. Adams testified that Counsel told her, up to and even on the day of trial, that the Petitioner's co-defendant would be present at trial. She said that both she and her son wanted the co-defendant present.

On cross-examination, Adams testified that she knew that the Petitioner's co-defendant would blame the Petitioner for the crime. She said that she talked to Counsel about witnesses that she thought were important, and he told her about witnesses he thought were important. She said that she had to assist Counsel because he was not "doing his job," and she did not see him vigorously cross-examine witnesses. Adams testified that she believed the story that the Petitioner told her that he was not the main perpetrator of this crime, and she said that it was the same story that he testified to at trial, which the jury rejected.

Alfred Blackburn testified that he is the Petitioner's father, and he spoke with Counsel once or sometimes twice a week for two years. Blackburn said that Counsel told him that they had "nothing to worry about. [The Petitioner] wasn't guilty, he knew he wasn't guilty, and he was going to prove that point." He said that he and Counsel discussed that the Petitioner's co-defendant had a violent rage and that the co-defendant was found with all of the items taken in the robbery. Blackburn testified that he gave Counsel the names of a few people who the co-defendant had asserted violence against.

On cross-examination, Blackburn testified that he and Counsel discussed this case about once or twice a week for two years, and they discussed the witness list. Blackburn said that he testified at trial, and the prosecutor would not let him tell the truth and kept objecting. He conceded that the co-defendant's penchant for violence came out during the trial, and the jury rejected that argument. On redirect examination, Blackburn testified that he told Counsel about an incident in which the co-defendant displayed violence against the victim, but he did not get to tell that story at the Petitioner's trial. Blackburn said that, during this incident, the co-defendant told him that the co-defendant was going to throw the victim in the river. He said that he could not tell this story in court because the co-defendant was not at the trial, even though Counsel told him that the co-defendant would be there. When he found out that the co-defendant would not be there, he told Counsel to stop the trial, but Counsel went ahead with the trial anyway. On re-cross-examination, Blackburn conceded that he actually did tell the story about the co-defendant's violence to the jury, but said that he has been in the hospital with a heart attack, a stroke, and a failing liver, so he did not remember telling the story.

The Petitioner testified that his co-defendant is also his cousin. He said that he has been incarcerated for this crime since August of 1996. The Petitioner said that another attorney

represented him during his preliminary hearing, and then Counsel represented him during the rest of the proceedings against him. The Petitioner said that he attempted to contact Counsel, but Counsel's secretary always answered because Counsel was "never there." The Petitioner said that Counsel never visited him in jail, and, while he met with Counsel before court proceedings, Counsel would never discuss his case with him. He testified that each of these meetings lasted ten minutes "at the most." He said the only time he discussed his case with Counsel was outside the courtroom the day before his trial. The Petitioner said that, prior to his trial, he received two letters from Counsel, one that asked him to submit to a blood test and one that informed him of his court date. He said that, after his trial, he received a letter telling him that Counsel would appeal his case.

The Petitioner said that he wrote Counsel letters and told him that he wanted "everything that pertained to [his] case so [he] could have somebody . . . look [at] it and . . . help [him] understand . . . ." He said that he never received any materials, including the statements of any witnesses, or a copy of any of his statements to police. He testified that Counsel never went over any of the Petitioner's statements with him. Further, Counsel did not interview witnesses that he asked Counsel to interview. The Petitioner said that Counsel never discussed with him the evidence that was against him, and the only thing that Counsel told him was that it would be in his best interests to testify. He said that, when he took the stand, he was unaware of any of the allegations that witnesses had made against him. The Petitioner said that it was Counsel's decision for him to take the stand.

The Petitioner said that he never received an offer from the State to plead guilty. He said that, one time when he was in court, he learned that his co-defendant was given an offer to plead guilty and, when he asked why he did not get one, he was told by the prosecutor that he could plead guilty too, but he would get a life sentence. The Petitioner said that Counsel never showed him an offer to plead guilty from the State.

The Petitioner testified that Counsel told him that everything was going to be "okay" and not to worry about anything. He said that Counsel told him "[w]e're going in under duress. There's no reason why you should be found guilty of murder when you done what you done under duress." The Petitioner said that Counsel told him that his co-defendant would be there the day of trial to testify. He said that, on the day of trial, when his co-defendant was not there he told Counsel that "you already know that our defense is based on him being here, because we can't get [any]thing on the stand," and Counsel told him that his co-defendant would be there. He testified that he asked Counsel to subpoena his co-defendant, but Counsel never did, and Counsel gave him no explanation as to why this was not done.

The Petitioner said that Counsel told him that, if he was found guilty, he could be put in prison for "a long time." Counsel did not tell him the possible sentences for his crime or that the sentences could be ordered to run consecutively. The Petitioner said that "the only thing" that he

–11–

discussed with Counsel was the fact that the Petitioner's co-defendant had all of the belongings that were taken from the victim during the robbery.

On cross-examination, the Petitioner testified that the fact that the victim's belongings were found on the Petitioner's co-defendant was presented to the jury at trial without the co-defendant testifying. The Petitioner testified that he did not know what charges he was facing until the morning of trial. He said that the attorney who represented him at his preliminary hearing did not tell him what charges he faced. He conceded that, while he had said that he did not know the possible sentences that he was facing, he knew he was facing life in prison for these crimes. He said that Counsel lied when he said that he relayed the State's offer to allow the Petitioner to plead guilty to second degree murder. The Petitioner said that he would have pled guilty had Counsel told him that he might be convicted and told him of the plea offer made by the State.

The Petitioner testified that he was brought to the jail near the courthouse on the day before his trial, but he did not meet with Counsel at that time. He said he did not meet with Counsel until the morning of his trial. At that time, Counsel discussed with him the defense of duress. He said that his defense at his trial was "the truth," and he presented this to the jury. He conceded that the jury rejected this defense, but said that they did so because his co-defendant was not there to testify. The Petitioner said that, while the jury heard testimony about the co-defendant being a violent man, they only heard it "somewhat." He said that he knew that the co-defendant had accused him of this crime, but the co-defendant might have accepted responsibility for this murder during the Petitioner's trial.

The Petitioner admitted that most of the evidence that the State presented at trial was also presented at his preliminary hearing, at which Counsel did not represent him. He then conceded that, while Counsel did not represent him at that time, he asserted in his petition in his post-conviction petition that Counsel was ineffective when he represented him at the preliminary hearing. The Petitioner conceded that some of the claims included in his petition for post-conviction relief did not apply to him. The Petitioner said that Counsel was ineffective because he did not communicate adequately with him. He said that, had he had more conversations with Counsel, he could have gotten more familiar with his case and there would have been a different outcome at his trial. The Petitioner could not provide any specific facts that he would have communicated to Counsel.

On redirect-examination, the Petitioner said that Counsel did not explain the defense of duress to him, and only told him that he would have to explain to the jury that he was "under fear for [his] life." The Petitioner said that Counsel never told him that, to prove duress, he would have to prove that there were no means for him to escape. The Petitioner reiterated that he did not know that he was charged with felony murder until the day of trial. He said that he knew he was charged with first degree premeditated murder and aggravated robbery, but he said that

–12–

Counsel never discussed the elements of these crimes with him.  The Petitioner said that a "jailhouse" lawyer filled out and filed his original petition for post-conviction relief in exchange for cigarettes.  He also said that his attorney at the preliminary hearing told him that duress was his best defense, but he did not discuss this defense with Counsel until the morning of the day of his trial.

On re-cross-examination, the Petitioner conceded that he could only speculate about how a difference in Counsel's actions would have affected his trial.  He admitted that he could not say with any certainty that, had anything different happened, it would have changed the outcome of his trial.

Carol Medley testified that she is the circuit court clerk assistant and she is primarily responsible for the criminal docket in Franklin County Circuit Court.  She testified about the orders to transport the Petitioner to court.  She said that the Petitioner was transported to court on May 13, 1997, November 17, 1998, and December 2, 1998.  She testified that, according to her orders, the Petitioner was not at the jail on November 16, 1998, when Counsel said that he met with the Petitioner.  Medley testified that the Petitioner was not transported to the court on November 13, 1997, the day Counsel said that he had a status conference with the Petitioner in the court.  On cross-examination, Medley conceded that her report does not reflect when the Petitioner was transported to court from other counties.  She conceded that her transport orders do not show that the Petitioner was present in court on November 6, 1996, but she was sure he was present in court because he filled out an affidavit of indigence on that day.

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition for post-conviction relief, and the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because Counsel failed to: (1) adequately prepare for trial; (2) give him an assessment of the evidence against him and the applicable law; (3) file a motion to suppress his statements to police; and (4) request any jury charges.  In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right.  Tenn. Code Ann. § 40-30-103 (2003).  The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence.  Tenn. Code Ann. § 40-30-110(f).  A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings.  Fields v. State, 40 S .W.3d 450, 456 (Tenn. 2001).  A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness.  Id. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to a de novo review. Id.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994). ..

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citation omitted); Thomas Brandon Booker v. State, No. W2003-00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004), *no perm. app. filed.* However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

## A. Adequate Trial Preparation

The Petitioner first asserts that Counsel was ineffective by failing to adequately prepare for trial. The post-conviction court found:

**Was trial counsel deficient by failing to properly prepare for trial?** The [Petitioner] complains that [Counsel] did not spend adequate time with him to prepare him for trial. [The Petitioner] had given the four statements to law enforcement long before [Counsel] was appointed. While these statements did support his defense, the statements were inconsistent in many respects. The [Petitioner] was related to the co-defendant and voluntarily spent time with him pr[ece]ding the night [the victim] was killed. Thus, the [Petitioner] had provided an arguable defense in his statements, but he also provided considerable grounds to attack his credibility both in the statements and in other events before and after [the victim's] death. Many facts were undisputed and the outcome of the trial was in large part dependent on whether the jury believed [the Petitioner's] testimony. The [Petitioner] has failed to show that [Counsel] spent inadequate time preparing him for trial.

[The Petitioner] further claims [Counsel] failed to talk with various state and defense witnesses prior to trial and did not call certain witnesses at trial which were necessary to adequately present his defense. [Counsel] testified he talked with many witnesses and read the statements of the other witnesses before trial. At trial, [Counsel] had been in practice some twenty-eight (28) years during which he had an active practice in criminal law and had tried numerous homicide cases. [Counsel] adequately cross-examined all state's witnesses and called any witnesses who would have appreciably added to the defense. Petitioner failed to call any such witnesses at the post-conviction hearing, therefore no prejudice was shown.

We conclude that the evidence does not preponderate against the trial court's findings of fact. Further, we conclude that the Petitioner has not met his burden of proving that Counsel's representation of him fell below an objective standard of reasonableness. This case presented a difficult set of circumstances. The Petitioner made multiple statements to police, as did his co-defendant. Counsel's strategy, under the circumstances, was to have the Petitioner testify and hope that the jury believed the Petitioner's story. We will not second guess this strategy on appeal. In accordance with Counsel's strategy, Counsel said that he interviewed many of the State's witnesses, but some he did not because he thought that such interviews were unnecessary. Counsel said that, in his twenty-eight years of experience, he was sure that some of the State's witnesses would not cooperate with him. Further, Counsel said that he met with the Petitioner on multiple occasions and had lengthy discussions with him regarding his case. Even the

–15–

Petitioner's father testified that he discussed this case with Counsel at least once a week for two years. The trial court found that Counsel adequately cross-examined each of the State's witnesses and presented an adequate defense. Accordingly, we conclude that the Petitioner has failed to meet his burden of proving that Counsel's representation fell below an objective standard of reasonableness. Furthermore, the Petitioner has not presented any evidence of how Counsel's alleged lack of preparation prejudiced him.

### B. Assessment of the Evidence and Applicable Law

The Petitioner asserts that Counsel was ineffective because he never informed him of what he would have to prove in order to establish the defense of duress. This is not an argument that was specifically ruled upon by the post-conviction court. At the post-conviction hearing, the Petitioner stated that his defense at trial was "the truth," and, while he presented this defense to the jury, the jury rejected this defense. The Petitioner then stated that Counsel did not explain the defense of duress to him, and only told him that he would have to explain to the jury that he was "under fear for [his] life." The Petitioner said that Counsel never told him that, to prove duress, he would have to prove that there were no means for him to escape. Counsel said that he explained to the Petitioner that the Petitioner had two possible defenses that they would present to the jury, one was duress and the other was that he did not participate in the actual crime itself. Counsel said that he did not "lecture" the Petitioner on the law of the duress, but rather he told the Petitioner to tell the truth, and they would let the jury decide if the law of duress applied. Counsel said that he explained to the Petitioner that this was the defense strategy, and he and the Petitioner "never had any disagreement about what was going to be done at trial." Under these circumstances, we conclude that the Petitioner has not proven that Counsel's representation fell below an objective standard of reasonableness. Further, he has not proven prejudice by showing how a difference in Counsel's assistance would have affected the verdict.

### C. Motion to Suppress

The Petitioner asserts that Counsel was ineffective because he failed to file a motion to suppress the Petitioner's statements to police. With regard to this issue, the post-conviction court found:

> **Was trial counsel deficient when he failed to seek exclusion of [the Petitioner's] statements?** The [Petitioner] gave four tape recorded statements concerning the death of [the victim]. The first three statements were given in the early morning hours of August 14, 1998. Before the first statement, Officer Warren read the [Petitioner] his Miranda rights . . . . Before the second and third statements [the Petitioner] was asked, and acknowledged that he still remembered his constitutional rights. Officer Warren again read and explained to the

[Petitioner] his constitutional rights before the fourth statement and again the [Petitioner] signed a waiver.

. . . .

[Counsel] of Winchester, Tennessee, admitted to the bar in 1970, represented the [Petitioner] at trial and had considerable trial experience in homicide cases. [Counsel] testified his defense strategy was to show that the co-defendant . . . had killed [the victim]. He further intended to show that [the co-defendant] was much larger than the [Petitioner] and had threatened and intimidated him on the night [the victim] was killed and that any involvement the [Petitioner] had in the events surrounding the murder was due to the duress placed on the [Petitioner] by [the co-defendant].

[Counsel] believed the four statements, taken as a whole, established the [Petitioner's] defense, and that he could not suppress any of the statements. He also believed the [Petitioner] would have to testify to establish this defense and if the [Petitioner] testified, he would be subject to cross-examination on all his statements, whether suppressed or not. Thus, he felt the statements would come out at trial, regardless. Both [Counsel] and the [Petitioner] testified the [Petitioner] wanted to tell the jury his story.

[Counsel] reviewed the statements given by the [Petitioner], spoke with witnesses and the [Petitioner], and determined a strategy that was reasonable, given the circumstances. [Counsel] developed a basic defense strategy that he would show his client did not commit the murder, that he would not challenge the statements, and that the [Petitioner] would explain any discrepancies in those statements. Such was an informed and adequately prepared defense and cannot now be second guessed.

We conclude that the evidence does not preponderate against the trial court's findings of fact. Further, we conclude that the Petitioner has not proven that Counsel's representation was ineffective. Counsel testified that his strategy, a strategy that the Petitioner agreed with, was to have the Petitioner testify and to tell the "truth" and hope that the jury believed the Petitioner. Counsel did not file a motion to suppress the Petitioner's statement for three reasons: (1) he could not find a legal basis for their suppression; (2) they would be admissible if the Petitioner testified; and (3) they were, on the whole, favorable to the Petitioner. These are strategic and tactical reasons for Counsel's actions and we will not second guess those reasons on appeal. Accordingly, we conclude that the Petitioner has not proven that Counsel's representation fell below an objective standard of reasonableness or that he was prejudiced by Counsel's actions.

## D.  Jury Charge

The Petitioner next contends that Counsel was ineffective by failing to request a duress jury instruction.  The post-conviction court found:

**Was trial counsel deficient in failing to request a jury charge on duress?** . . . .

[Counsel] did not request a jury charge on duress and none was given. [Counsel] testified the [Petitioner] had always stated [the co-defendant] pushed [the victim] into the lake and it was his strategy to show that the [Petitioner] simply did not participate; not that he participated in the actual drowning because he was forced to do so by the co-defendant.  This defense requires that a defendant experience a well-grounded apprehension of death or serious bodily injury but be unable to withdraw in safety before he commits the illegal act. [The Petitioner] testified to no alleged threats from [the co-defendant] other than verbal ones.  Regardless, the defense is unavailable to one who "intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that he would be subjected to compulsion" when according to the [Petitioner], he remained on the scene and tied the victim's legs after [the co-defendant] announced he was going to rob and kill [the victim].  See, T.C.A. § 39-11-504(b). While this court does not find that trial counsel's performance in this regard was deficient under the first prong of the analysis, even if so, under the second prong the result of the trial would not in all reasonable likelihood have been different if the charge of duress had been given.

Counsel testified that one of the two defenses that he attempted to prove to the jury was duress.  His strategy was to have the Petitioner testify and allow the judge and the jury to determine whether the defense of duress applied.  After the Petitioner testified, Counsel determined that the defense of duress did not apply, and he did not request such a charge from the judge.  Under the circumstances, we conclude that Counsel should have requested a duress charge.  This was clearly one of his defenses, and it is within the judge's purview to determine whether the elements are present sufficiently to instruct the jury on duress.  We cannot, however, conclude that Counsel's failure to request this instruction prejudiced the Petitioner.  The elements of duress were not present from the Petitioner's testimony, as was clearly explained by the post-conviction court.  Therefore, the trial court would not have instructed the jury on duress, even if Counsel had requested such a jury charge.  The Petitioner has not met his burden of proving that Counsel's actions prejudiced him.  This issue is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment dismissing the Petitioner's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE